THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONNA L. DRAINA,                      :
                                      :
          Plaintiff                   :
                                      :        3:12-CV-00841
     vs.                              :
                                      :        (Judge MARIANI)
CAROLYN W. COLVIN, ACTING             :
COMMISSIONER OF SOCIAL                :
SECURITY,                             :
                                      :
          Defendant                   :

## MEMORANDUM

### Background

The above-captioned action is one seeking review of a decision of the

Commissioner of Social Security ("Commissioner") denying Plaintiff Donna L. Draina's

claim for social security disability insurance benefits.

Draina protectively filed her application for disability insurance benefits on

November 20, 2008. Tr. 22, 95, 125-131 and 137.[1] The application was initially denied

by the Bureau of Disability Determination[2] on April 23, 2009. Tr. 22 and 99-104. On May

21, 2009, Draina requested a hearing before an administrative law judge. Tr. 22 and 111-

112. After about 12 months had passed, a hearing was held on May 12, 2010, before an

administrative law judge. Tr. 22 and 39-73. Draina was represented by counsel at the

hearing. Id. On June 22, 2010, the administrative law judge issued a decision denying

---

1.    References to "Tr._" are to pages of the administrative record filed by the
Defendant as part of the Answer on July 17, 2012.

2.    The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social Security
Administration. Tr. 99.

Draina's application.[3] Tr. 22-34. As will be explained in more detail *infra* the administrative law judge found that Draina could perform the full range of work from an exertional standpoint[4] but had some non-exertional limitations. Tr. 27. On July 19, 2010,

---

3. Draina had filed a prior application for disability insurance benefits on February 12, 2007. Tr. 137. That application was denied by an administrative law judge on November 14, 2008, and the Appeals Council denied a request for review on January 16, 2009. Id. Draina has conceded that in the present case the administrative law judge could only consider whether Draina had been disabled since November 15, 2008, the day after the prior application was denied. Document 6, Plaintiff's Brief, at 2 n.1. The relevant time period in reviewing the present case is November 15, 2008, through June 22, 2010, the date the administrative law judge denied Draina's second application for disability insurance benefits. Id. at 3 & 4 nn. 2 & 4.

4. The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

> (d) *Heavy work.* Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(continued...)

2

Draina filed a request for review with the Appeals Council and after about 20 months had elapsed the Appeals Council on March 6, 2012, concluded that there was no basis upon which to grant Draina's request for review. Tr. 1-6 abd 16-18.

Draina then filed a complaint in this court on May 4, 2012. Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on October 15, 2012, when Draina filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Draina met the insured status requirements of the Social Security Act through December 31, 2010. Tr. 23-24 and 138.

Draina, who was born in the United States on October 5, 1959,[6] graduated from high school and can read, write, speak and understand the English language and

---

4.  (...continued)
    (e) *Very heavy work.* Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 416.967.

5.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

6.  At the time of the administrative hearing held in this case Draina was 50 years of age. Under the Social Security regulations a person 50 to 54 years of age is considered a "person closely approaching advanced age." 20 C.F.R. § 404.1563(c). The Social Security Administration considers a claimant 50 to 54 who has a severe impairment and limited work experience as someone who may not be able to adjust to other work. Id.

3

perform basic mathematical functions such as counting change and using a checkbook and money orders. Tr. 149, 154, 160 and 268. During her elementary and secondary schooling, Draina attended regular education classes. Tr. 154. After graduating from high school, Draina did not complete "any type of special job training, trade or vocational school" but did attend college for one year. Id.

Draina's work history covers 22 years and at least 7 different employers. Tr. 139 and 151. The records of the Social Security Administration reveal that Draina had earnings in the years 1977 through 1980, 1984 through 1991, and 1997 through 2006.[7] 139. Draina's annual earnings range from a low of $329.44 in 1977 to a high of $12,427.85 in 1990. Id. Draina's total earnings during those 22 years were $136,110.65. Id.

Draina in a document filed with the Social Security Administration stated that she worked (8 hours per day, 5 days per week) as a computer coder in the garment industry from October, 1978, to June, 1979; as the head of sales for a department store (8 hours per day, 5 days per week) from July, 1985 to August, 1988; as a credit and collections agent for a gas company (8 hours per day, 5 days per week) from August, 1996 to January, 1998; as a dispatcher for a gas company (4 hours per day, 5 days per week) from January, 1998 to February, 2000;[8] as a secretary for a non profit

---

7.   Draina testified that she last worked in 2006 as a kitchen helper for only "four hours" per day. Tr. 59. In a document entitled "Disability Report - Adult - Form SSA - 3368" Draina indicates that she stopped working on January 2, 2006, and then in the same document stated that she worked 8 hours per day, 5 days per week as a kitchen helper from October, 2006 to November, 2006. Tr. 150-151.

8.   Draina in a second document stated that she worked for "UGI (PG Energy)," Wilkes-Barre, Pennsylvania, from 1998, to August, 1999, and her duties performed involved "dispatch[ing] work orders, gas leaks, emergencies, data entry, [and] document[ing] workers stops." Tr. 187 (Social Security Administration, Office of
(continued...)

4

organization (8 hours per day, 5 days per week) from September, 1999 to September, 2000;[9] as a school van driver for the handicapped (5 hours per day, 5 days per week) from October, 2001 to January, 2006;[10] and as a kitchen helper for a school district (8 hours per day, 5 days per week) from October, 2006 to November, 2006.[11] Tr. 151 (Disability Report - Adult - Form SSA - 3368) .

Draina has past relevant employment[12] as  (1) a collection worker which was described as skilled, sedentary work by a vocational expert, (2) a dispatcher which was described as skilled, sedentary work, (3)  a driver described as semi-skilled, medium work as generally performed in the economy but light work as actually performed by Draina, and (4) a secretary described as semi-skilled, sedentary work. Tr. 68.

Draina in her application for disability insurance benefits claimed that she became disabled on January 2, 2006.  However, because there was a prior application asserting the same onset date and a decision dated November 14, 2008, the disability onset date for purposes of review of the Commissioner's decision is November 15, 2008,

8.  (...continued)
Hearings and Appeals, Form HA-4633, Claimant's Work Background)..

9.   Draina in a second document stated that she worked for Earth Conservancy, Ashley, Pennsylvania,  from September, 1999, to August, 2000, and her duties performed involved "phones, petty cash, filing, copying, errands, set[ting] up meetings [and] data entry." Id.

10.   Draina in a second document stated that she worked for Chivarella, Inc., Mountain Top, Pennsylvania,  from October, 2001 to October 2006, "transporting special needs students to [and] from school." Id.

11.   Draina in a second document stated that she worked for Hanover Area High School, Hanover Township, Pennsylvania,  from September, 2006, to November, 2006, "preparing and serving food for school students [and] cleanup." Id.

12.   Past relevant employment in the present case means work performed by Draina during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

5

which we will refer to as the "effective disability onset date." Draina claims that she is unable to work because of mental and physical impairments. Tr. 149. Draina identified agoraphobia, panic attacks, anxiety and depression as her mental health impairments and high blood pressure and irritable bowel syndrome as her physical impairments. Id. Draina alleges that she gets fatigued "fast and often," that she has to "use the bathroom frequently and often," she cannot "concentrate or focus for long period[s] of time," and she "suffer[s] from mood swings and panic attacks" with associated "difficulties working around others." Tr. 178. She claims that her condition has gradually worsened over time. Id.

Although Draina has alleged some physical impairments, her main disabling impairments relate to her mental functioning. In a "Function Report - Adult" completed by Draina when asked to check items which are affected by her illnesses or conditions did not check the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing and using hands. Tr. 162. Instead Draina alleged that her impairments impacted the following: talking, memory, completing tasks, concentration, understanding, following instructions and getting along with others. Id.

For the reasons set forth below we will affirm the decision of the Commissioner denying Draina's application for disability insurance benefits.

## Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42

U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record

7

fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate. Id.

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

8

lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his
> physical or mental impairment or impairments are of such severity that he is
> not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy, regardless of whether
> such work exists in the immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he would be hired if he
> applied for work. For purposes of the preceding sentence (with respect to
> any individual), "work which exists in the national economy" means work
> which exists in significant numbers either in the region where such
> individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability

insurance and supplemental security income claims. See 20 C.F.R. §404.1520; Poulos,

474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity,[13] (2) has an impairment

that is severe or a combination of impairments that is severe,[14] (3) has an impairment or

---

13. If the claimant is engaging in substantial gainful activity, the claimant is not
disabled and the sequential evaluation proceeds no further. Substantial gainful activity
is work that "involves doing significant and productive physical or mental duties" and "is
done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

14. The determination of whether a claimant has any severe impairments, at step
two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If
a claimant has no impairment or combination of impairments which significantly limits
the claimant's physical or mental abilities to perform basic work activities, the claimant
is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any
severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g).
Furthermore, all medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§
404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or
mental abilities when its effect on the claimant to perform basic work activities is more
than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift,
carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An
individual's basic mental or non-exertional abilities include the ability to understand,
carry out and remember simple instructions, and respond appropriately to supervision,
(continued...)

9

combination of impairments that meets or equals the requirements of a listed impairment,[15] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[16]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Draina's medical records. We will primarily

---

14.  (...continued)
coworkers and work pressures. 20 C.F.R. § 1545(c).

15.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

16.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

10

focus on medical records of treatment received by Draina after the effective disability

onset date of November 15, 2008.

From January 15, 2008, through November 6, 2008, Draina was examined

and treated on eight occasions by Matthew Berger, M.D., a psychiatrist practicing in

northeastern Pennsylvania. Tr. 247-249, 318-331 and 367-383. On those eight

occasions the results of a mental status examination performed by Dr. Berger were the

same. Id. Specifically, Dr. Berger each time reported the following:

> Patient's attitude is cooperative. Displays cooperation and anxiety
> periodically during encounter. Patient's affect is appropriate. Speech
> is clear, fluent and spontaneous. No aphasia noted while speaking.[17]
> No apparent agnosia present.[18] Language processing is intact. Thought
> processes demonstrate coherence and logic. Associative thinking is
> intact. Patient does not have delusions or hallucinations. Suicidality:
> none. Homicidality: none. Dangerousness: none. Alert and oriented
> x 3. Immediate, recent and remote memory intact. Attention span and
> concentration are normal. Judgement (sic) is realistic and intact. Insight
> is appropriate and intact. Knowledge and vocabulary are consistent with
> education.

Id. On each occasion Dr. Berger's diagnostic assessment was that Draina suffered from

panic disorder and depressive disorder, atypical, and gave Draina a Global Assessment

---

17.  Aphasia is defined as "any of a large group of language disorders involving
defects or loss of the power of expression by speech, writing, or signs, or of
comprehending spoken or written language, due to injury or disease of the brain or to
psychogenic causes." Dorland's Illustrated Medical Dictionary, 115 (32nd Ed. 2012).

18.  Agnosia is defined as "loss of power to recognize the import of sensory stimuli;
the varieties correspond with the several senses and are distiguished as auditory,
visual, olfactory, gustatory, and tactile." Dorland's Illustrated Medical Dictionary, 40 (32nd
Ed. 2012).

of Functioning (GAF) score of 55, representing moderate symptomatology.[19] Id. Also, at

each of the appointments it was noted that Draina walked with a normal gait. Id.

At the appointment on November 6, 2008, Dr. Berger prescribed the

psychotropic drugs Geodon, Cymbalta and Xanax and recommended supportive

psychotherapy. Tr. 248-249.

Also from January to November 6, 2008, Draina had three follow-up

appointments regarding complaints of high blood pressure with medical providers at

Intermountain Medical Group, P.C.[20] Tr. 194-199. At each of the appointments Draina

---

19. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

20. There are two signatures on each of the reports of these appointments: three that are illegible of a certified physician assistant (PA-C) and on two of the reports in addition to the illegible signature of the PA-C the signature of Micheal J. Grasso, M.D. Tr. 194-199.

12

reported anxiety and mood changes but denied depression, hallucinations, suicide attempts, and suicidal thoughts or plans. Id. She also denied gastrointestinal symptoms and fatigue. Id. The results of physical examinations were essentially normal other than Draina was obese[21] and suffering from high blood pressure. Id. Also the results of mental status examination performed at this appointment were normal. Id. Specifically, on each occasion it was stated as follows: "Alert and oriented x3. Patient's attitude is cooperative. Mood is normal. Patient's affect is appropriate to mood. Intact recent, remote and immediate memory. Speech is clear and fluent. Suicidality: none. Homicidaltiy: none. Dangerousness: none." Id. Draina was prescribed medications for his high blood pressure. Id.

On December 5, 2008, 15 days after Draina filed his application for disability insurance benefits, 20 days after the effective disability onset date, and a month after Dr. Berger last examined Draina, Dr. Berger issued a "To whom it May Concern" letter which states in toto as follows:

> Donna Draina, DOB 10-05-1959 is under my care for Panic Disorder and Major Depression, Recurring. She is presently incapacitated by the

21. Draina weighed 247 pounds at an appointment on April 10, 2008, 250 pounds at an appointment on May 22, 2008, and refused to be weighed at an appointment on November 4, 2008. Tr. 194-199. Draina is 5'3"" tall. Id. An individual of such height and weight has a body mass index of 43.7 and 44.3, respectively, and is considered morbidly obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator,http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calc ulator/bmi_calculator.html (Last accessed December 27, 2013). "Doctors often use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese." Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www.Mayoclinic.com/health/obesity/DS00314 (Last accessed December 27, 2013). Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when the person has a BMI of 40 or more. With morbid obesity, the person is especially likely to have serious health problems. Id.

13

symptoms of her affective disorders and precluded from any form of part, or full time employment. This incapacity is expected to continue for more than one year from now.

Tr. 311. Also, on February 23, 2009, Dr. Berger wrote a letter to Draina's attorney in which he stated that he has been treating Draina since February 1, 2007, and that "[t]hrough mental status exams and clinical assessments, it has been deemed that patient does indeed have panic disorder with agoraphobia[22] and that "[h]er history is

_____

22. According to the National Institutes of Health's website

Panic disorder with agoraphobia is an anxiety disorder in which a person has attacks of intense fear and anxiety. There is also a fear of being in places where it is hard to escape, or where help might not be available.

Agoraphobia usually involves fear of crowds, bridges, or being outside alone. . .

Panic attacks involve short periods of intense symptoms, which peak within 10 minutes. Panic attack symptoms can include:

• Chest pain or discomfort
• Choking
• Dizziness or faintness
• Fear of being out of control

\*     \*     \*     \*     \*     \*     \*     \*     \*

• Numbness or tingling
• Racing Heart
• Shortness of breath
• Sweating
• Trembling

With agoraphobia, you avoid places or situations because you do not feel safe in public places. The fear is worse when the place is crowded.

Panic Disorder with agoraphobia, MedlinePlus, U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency /article/000923.htm(Last accessed December 26, 2013).

significant for moderate to severe symptoms which have been worsening over time causing her to become more and more reclusive." Tr. 354. Dr. Berger then noted Draina's subjective complaints, including being fearful of going outside or coming in contact with neighbors, and that she was on several psychotropic medications and receiving supportive psychotherapy. Tr. 354-355. Dr. Berger concluded the letter by stating that it was "his opinion within a reasonable degree of medical certainty that the patient cannot do full time competitive work, and is permanently disabled due to her psychiatric disorder" and the disability "is expected to last greater than 12 months." Tr. 355. There is no indication that Dr. Berger examined Draina on February 23, 2009, or between November 6, 2008, and that date.

On March 5, 2009, Draina had an appointment with Dr. Berger at which she told Dr. Berger that she was "about the same" and that she lost her insurance, her husband was laid off and she was no longer taking Cymbalta and Geodon because of the loss of insurance and she was only taking Xanax. Tr. 312. She also reported that she was having ongoing anxiety (including social anxiety), increased sadness, frequent worrying, side effects of tiredness from taking Xanax, ongoing shortness of breath, and frequent ruminations and she was easily overwhelmed but that her appetite was good and her ability to sleep had improved; she had decreased chest pain; her concentration was fair; she had decreased depersonalization; she had infrequent dizziness; her energy level was fair; her motivation was improved; and she denied and did not demonstrate any symptoms of attention deficit hyperactivity disorder, bipolar disorder, dementia, depression, an eating disorder or a thought disorder. Id. The results of a mental status

15

examination performed by Dr. Berger were essentially normal. Tr. 313. Specifically, Dr. Berger stated as follows:

> Patient's attitude is cooperative. Displays cooperation and anxiety periodically during encounter. Patient's affect is appropriate. Speech is clear, fluent and spontaneous. No aphasia noted while speaking. No apparent agnosia present. Language processing is intact. Thought processes demonstrate coherence and logic. Associative thinking is intact. Patient does not have delusions or hallucinations. Suicidality: none. Homicidality: none. Dangerousness: none. Alert and oriented x 3. Immediate, recent and remote memory intact. Attention span and concentration are normal. Judgement (sic) is realistic and intact. Insight is appropriate and intact. Knowledge and vocabulary are consistent with education.

Tr. 313. In contrast to his letters of February 23, 2009, where Dr. Berger indicated that Draina suffered from agoraphobia, Dr. Berger's diagnostic assessment was panic disorder without[23] agoraphobia and depressive disorder, atypical, and he gave Draina a GAF score of 55, representing moderate symptomatology. Id.

Also, on March 5, 2009, Dr. Berger completed a document entitled "Psychiatric/Psychological Impairment Questionnaire" which apparently was submitted to him for completion by Draina's attorney. Tr. 356-363. In that document Dr. Berger stated that Draina suffered from depressive disorder, atypical, and panic disorder. Tr. 356. Dr. Berger gave Draina a GAF score of 55 and stated that she had a poor prognosis. Id. Dr. Berger listed the following clinical findings which he claimed supported his diagnosis: sleep disturbance, mood disturbance, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, difficulty

---

23.   Dr. Berger used the medical abbreviations "W/O" for without. See Glossary of Medical Terms, Upstate University Hospital, State University of New York, http://www.upstate.edu/hospital/patients/glossary.php (Last accessed December 27, 2013).

16

thinking or concentrating, social withdrawal or isolation, decreased energy, and generalized persistent anxiety. Tr. 357. He also noted dizziness, lightheadedness, chest pain, depersonalization and ruminations as other clinical signs supporting the diagnosis. Id. Dr. Berger further stated that his mental status examinations and clinical assessments supported his diagnosis. Id. At a later point in the document, Dr. Berger indicated that Draina's "primary symptoms" were "panic attacks with agoraphobia" and "social anxiety." Tr. 358.

On April 22, 2009, Anthony Galdieri, Ph.D., a psychologist, reviewed Draina's medical records and concluded that she suffered from depressive disorder, not otherwise specified, and panic disorder but that these conditions did not meet the requirements of any listed mental impairment at step 3 of the sequential evaluation process. Tr. 413-418 and 423. Dr. Galdieri further found that Draina was moderately limited in several mental work-related functional abilities. Tr. 426-427. Specifically, he found that Draina was moderately limited in her ability to (1) maintain attention and concentration for extended periods, (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (3) interact appropriately with the general public, (4) accept instructions and respond appropriately to criticism from supervisors, (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (6) travel in unfamiliar places or use public transportation. Id. Despite these moderate limitations resulting from her impairments, Dr. Galdieri, found that Draina was still "able to meet the basic mental demands of competitive work on a sustained basis[.]" Tr. 426-428.

17

On April 30, 2009, Dr. Berger completed a document on behalf of Draina entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)."[24] Tr. 406-408. In the document Dr. Berger stated that Draina had moderate limitations with respect to understanding and remembering short, simple instructions and carrying out short simple instructions; and Draina had marked limitations understanding and remembering detailed instructions, carrying out detailed instructions, making judgments on simple work-related decisions, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting. Tr. 407. Dr. Berger stated that Draina has severe anxiety which interferes with her ability to concentrate and carry out even simple instructions and is "agoraphobic which interferes [with] her ability to leave her home." Tr. 407-408.

On May 20, 2009, Draina had an appointment with Dr. Berger at which Draina reported ongoing anxiety (including social anxiety and excessive worry), ruminations (which were frequent), sadness (which had increased), chest pain, depersonalization, rapid heart beat, palpitations, lightheadedness and shortness of breath. Tr. 437. Draina stated that her appetite was good, she had infrequent dizziness, and her concentration was fair. Id. Draina denied and did not demonstrate any symptoms of attention deficit hyperactivity disorder, bipolar disorder, dementia, depression, a eating disorder or a thought disorder. Id. The results of a mental status examination performed by Dr. Berger were essentially normal. Tr. 313. Specifically, Dr. Berger stated as follows:

---

24. This document appears to be a form routinely used by the Bureau of Disability Determination.

18

> Patient's attitude is cooperative. Displays cooperation and anxiety
> periodically during encounter. Patient's affect is appropriate. Speech
> is clear, fluent and spontaneous. No aphasia noted while speaking.
> No apparent agnosia present. Language processing is intact. Thought
> processes demonstrate coherence and logic. Associative thinking is
> intact. Patient does not have delusions or hallucinations. Suicidality:
> none. Homicidality: none. Dangerousness: none. Alert and oriented
> x 3. Immediate, recent and remote memory intact. Attention span and
> concentration are normal. Judgement (sic) is realistic and intact. Insight
> is appropriate and intact. Knowledge and vocabulary are consistent with
> education.

Tr. 437-438. In contrast to the letter of February 23, 2009, and the assessments of

March 5 and April 30, 2009, where Dr. Berger indicated that Draina suffered from

agoraphobia, Dr. Berger's diagnostic assessment was panic disorder without

agoraphobia and depressive disorder, atypical, and he gave Draina a GAF score of 55,

representing moderate symptomatology. Id.

On July 1, 2009, Draina had an appointment with medical providers at

Intermountain Medical Group, P.C., regarding her high blood pressure.[25] Tr. 435-436. At

that appointment Draina denied chest discomfort, chest tightness, dizziness, edema,

fatigue, orthopnea, palpitations and syncope and she had no specific complaints. Tr.

435. Draina reported that she had no side effects from her medications and denied back

pain, chills, cough, cramping, cyanosis, diarrhea, dyspnea, edema, faintness, fever,

headache, leg pain, nausea, paresthesia, joint stiffness, weakness and wheezing. Id.

Draina specifically denied fatigue, gastrointestinal symptoms, depression, hallucinations,

suicide attempts, and suicide thoughts or plan but reported anxiety and mood changes.

Id. The report of this appointment indicates that Draina had a history of pernicious

---

25. There are two signatures on the report of this appointment: an illegible one of a
certified physician assistant and Michael J. Grasso, M.D. Tr. 436.

anemia but that she was not taking any medications for that condition and she was "feeling well" and denied fatigue. Id. Her current medications were the blood pressure medications Lisinopril, Hydroclorothiazide and Atenolol, and the psychotropic medications Xanax, Risperdal, Effexor, Geodon and Cymbalta. Id. The results of a physical examination were essentially normal, including Draina's blood pressure was 118/80. Id. The results of a mental status examination were as follows: "Alert and oriented x3. Patient's attitude is cooperative. Mood is normal. Patient's affect is appropriate to mood. Intact recent, remote and immediate memory. Speech is clear and fluent. Suicidality: none. Homicidality: none. Dangerousness: none." Id. The diagnostic assessment was high blood pressure, controlled; pernicious anemia; and anxiety state unspecified. Tr. 436. A follow-up appointment was scheduled in 4 months and it appears that the medication Cymbalta was discontinued but she was prescribed the Xanax, Effexor and Geodon mentioned above but there was no indication as to whether she was directed to continue to take Risperdal. Id.

On July 22, 2009, Draina had an appointment with Dr. Berger at which Draina reported that she was "anxious and a little depressed." Tr. 440. Draina reported that "some of her anxiety may be from her husband being home all the time" and "[w]hen he is out of the house, she feels as if her anxiety is relieved somewhat." Id. She also reported that "she gets extremely anxious when leaving the house and especially to come to her appointments." Id. Draina's current medications were listed to be Lisinopril, Atenolol, Geodon, Xanax and Effexor. Id. The physical examination findings reported were normal, including she walked with a normal gait. Id. The results of a mental status examination were as follows:

20

> Patient's attitude is cooperative. Improvement in mood since last visit. Patient's affect is appropriate. Speech is clear, fluent and spontaneous. No aphasia noted while speaking. No apparent agnosia present. Language processing is intact. Thought processes demonstrate coherence and logic. Associative thinking is intact. Patient does not have delusions or hallucinations. Suicidality: none. Homicidality: none. Dangerousness: none. Alert and oriented x 3. Immediate, recent and remote memory intact. Attention span and concentration are normal. Judgement (sic) is realistic and intact. Insight is appropriate and intact. Knowledge and vocabulary are consistent with education.

Tr. 440-441. In contrast to his letters of February 23, 2009, and the assessments of March 5 and April 30, 2009, where Dr. Berger indicated that Draina suffered from agoraphobia, Dr. Berger's diagnostic assessment was panic disorder without agoraphobia and depressive disorder, atypical, and he gave Draina a GAF score of 55, representing moderate symptomatology. Id. Dr. Berger prescribed the medications Effexor, Geodon and Xanax and referred her to supportive psychotherapy. Tr. 441. He also noted that her anxiety was "related to situational stressors." Id.

Draina had appointments with Dr. Berger on August 24, October 26 and December 11, 2009. Tr. 442-448. There was no change in Dr. Berger's physical or mental status examination findings other than on August 24th and October 26th Dr. Berger noted an improvement in Draina's mood and on December 11th a worsening in her mood. Id. Dr. Berger's diagnostic assessment remained the same at each of these appointments: panic disorder without agoraphobia, atypical depressive disorder and a GAF score of 55. Id. Dr. Berger continued to prescribe psychotropic medications and referred her to supportive psychotherapy. Id.

No treating physician provided a functional assessment indicating that Draina was disabled from a physical standpoint.

21

## Discussion

The administrative law judge at step one of the sequential evaluation process found that Draina had not engaged in substantial gainful work activity since January 2, 2006, the onset date alleged in Draina's application. Tr. 25 and 125.

At step two of the sequential evaluation process, the administrative law judge found that Draina had the following severe impairments: "obesity, depressive disorder and anxiety disorder[.]" Id. The administrative law judge found that Draina's high blood pressure was not a severe impairment because it was controlled for the most part with medications and there was no indication it caused work-related limitations and that her irritable bowel syndrome was a non-severe impairment because there was no medical evidence of the treatment of that condition or that it caused work-related limitations. Id.

At step three of the sequential evaluation process the administrative law judge found that Draina's impairments did not individually or in combination meet or equal a listed impairment. Tr. 25-27.

At step four of the sequential evaluation process the administrative law judge found that Draina could not perform her past relevant semiskilled and skilled, sedentary and medium work as a collection worker, dispatcher, driver and secretary but that she had the residual functional capacity to perform a full range of work at all exertional levels but with certain non-exertional limitations. Tr. 27. Specifically, the ALJ required that the positions had to involve a stable work setting not subject to frequent changes; the work had to be of an independent nature and not positions involving teamwork; the work had to involve moderate supervision and no high intensity volume or

22

quota system supervision; the work had to involve no direct contact with the public with only the occasional presence of members of the public; the work had to involve no customer service contact with the public such as dealing with complaints; the work had to be unskilled involving simple, routine work, no processing of complex instructions, and not requiring a great deal of memorization or recalling of instructions; and the work had to be inside with ready access to a bathroom. Id.

In setting this residual functional capacity, the administrative law judge considered Draina's credibility, past work and her activities of daily living, and the medical records and the opinions of the treating physicians. Tr. 27-32. The administrative law judge stated that

> [c]laimant is independent in her activities of daily living, is helped by her family with some chores, attends her appointments on a regular basis, is able to tend to her personal care although she reports not doing this daily; prepares simple meals; reports no problems with her relationship with her sons or husband, and no problem dealing with people she comes in contact with when attending therapy and other medical appointments.

Tr. 30. The administrative law judge found that Draina's statements concerning the intensity, persistence and limiting effects of her impairments were not credible to the extent that they were inconsistent with her ability to engage in the work as described above. Tr. 28. The ALJ further found that Dr. Berger's disability opinions were not supported by his treatment notes and were internally inconsistent in that he consistently gave Draina a GAF score of 55 representing moderate symptomatology. Tr. 29-30. The ALJ also relied upon the opinion of Dr. Galdieri, the state agency psychologist, in rejecting the disability opinions of Dr. Berger. Tr. 31-32. Finally, the ALJ gave Draina the benefit of the doubt by requiring that her work be inside with ready access to a restroom,

23

and of an unskilled and independent nature not involving the general public or constant supervision. Tr. 32.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found at step five of the sequential evaluation process that Draina could perform unskilled work as a garment trimmer, a tagger and a machine operator, and that there were a significant number of such jobs in the regional, state and national economies. Tr. 33. The vocational expert identified all of these positions as unskilled, light duty work. Tr. 69-70.

The administrative record in this case is 482 pages in length, primarily consisting of medical and vocational records. Draina argues that (1) the ALJ failed to properly evaluate the medical evidence and (2) failed to properly evaluate Draina's credibility.

We have thoroughly reviewed the record in this case and find no merit in Draina's arguments. The administrative law judge did an adequate job of reviewing Draina's vocational history and medical records in his decision. Tr. 22-34. Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 7, Brief of Defendant.

Initially we will note that no treating physician submitted a functional assessment of Draina which indicated that she was functionally impaired from a physical standpoint for the requisite continuous 12 month period.[26] Second, Dr. Berger's disability

---

26. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." (continued...)

24

opinion was not supported by his treatment notes or the GAF scores which he gave

Draina. Furthermore, Dr. Berger's opinion was contradicted by the opinion of Dr.

Galdieri.

The administrative law judge rejected the disability opinions of Dr. Berger.

The Court of Appeals for this circuit has set forth the standard for evaluating the opinion

of a treating physician in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000). The Court of

Appeals stated in relevant part as follows:

> A cardinal principle guiding disability eligibility
> determinations is that the ALJ accord treating
> physicians' reports great weight, especially "when
> their opinions reflect expert judgment based on a
> continuing observation of the patient's condition
> over a prolonged period of time." . . . The ALJ
> must consider the medical findings that support a
> treating physician's opinion that the claimant is
> disabled. In choosing to reject the treating
> physician's assessment, an ALJ may not make
> "speculative inferences from medical reports" and
> may reject "a treating physician's opinion outright
> only on the basis of contradictory medical evidence"
> and not due to his or her own credibility judgments,
> speculation or lay opinion.

Id. at 317-18 (internal citations omitted). The administrative law judge is required to

evaluate every medical opinion received. 20 C.F.R. § 404.1527(d). In the present case,

the administrative law judge in his decision specifically addressed the opinions of Dr.

Berger as well as the credibility of Draina. Tr. 28-32.

The social security regulations specify that the opinion of a treating

physician may be accorded controlling weight only when it is well-supported by medically

---

26. (...continued)
42 U.S.C. § 432(d)(1)(A).

25

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence. An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements. 20 C.F.R. § 404.1508 (2007). The administrative law judge appropriately considered the contrary opinion of Dr. Galdieri and the objective medical evidence and concluded that the opinion of Dr. Berger was not adequately supported by objective medical evidence consisting of signs, symptoms and laboratory findings.

The administrative law judge relied on the opinion of Dr. Galdieri, the state agency psychologist, who review Draina's medical records. The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

As for Draina's argument that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Draina's claims regarding her physical or mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly

26

since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6ᵗʰ Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10ᵗʰ Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Draina testify, the administrative law judge is the one best suited to assess her credibility.

We are satisfied that the administrative law judge appropriately took into account all of Draina's mental and physical limitations in the residual functional capacity assessment.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

Robert D. Mariani
United States District Judge

Date: December 30, 2013

27